UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MAURICE YOUNG, *et al..* ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 1:17-cv-2818-TWP-MJD |
| ) | |
| CITY OF INDIANAPOLIS, ) | |
| ) | |
| Defendant. ) | |

**Memorandum in Support of Motion for Preliminary Injunction**

**Introduction**

The City of Indianapolis issued an "Emergency Declaration," in effect on the broad sidewalks under railroad underpasses immediately north of South Street on Pennsylvania Street, Meridian Street, Illinois Street, and Capitol Avenue in Indianapolis' downtown area. These underpass sidewalks have, in the past, been frequented by homeless persons. Although the declaration refers to removing physical property, it has been interpreted by Indianapolis law enforcement as prohibiting homeless persons from being in these areas. However, it is not at all clear what conduct is or is not allowed in these areas and this vagueness offends due process. Due process is also offended by the sheer irrationality of the City's endeavor here. Moreover, a similar prohibition has not been imposed on persons who are not homeless, which is an obvious violation of equal protection. All the requirements for the grant of a preliminary injunction are met and one should issue, without bond.

**The preliminary injunction standard**

The standard in the Seventh Circuit for the granting of a preliminary injunction is clear. In order to determine whether a preliminary injunction should be granted, the Court weighs several factors:

> (1) whether the plaintiff has established a prima facie case, thus demonstrating at least a reasonable likelihood of success at trial;
>
> (2) whether the plaintiff's remedies at law are inadequate, thus causing irreparable harm pending the resolution of the substantive action if the injunction does not issue;
>
> (3) whether the threatened injury to the plaintiff outweighs the threatened harm the grant of the injunction may inflict on the defendant; and
>
> (4) whether, by the grant of the preliminary injunction, the public interest would be disserved.

*See, e.g., Baja Contractors, Inc. v. City of Chicago*, 830 F.2d 667, 675 (7th Cir. 1987). The heart of this test, however, is "a comparison of the likelihood, and the gravity of two types of error: erroneously granting a preliminary injunction, and erroneously denying it." *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 590 (7th Cir. 1984). Thus, "the more likely [the preliminary injunction movant] is to win, the less the balance of harms must weigh in his favor." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015).

**Facts**

It is believed that the following facts will be adduced in support of the

preliminary injunction request.[1]

Immediately north of South Street in Indianapolis are four railroad underpasses on Pennsylvania Street, Meridian Street, Illinois Street, and Capitol Avenue. (ECF No. 12-1 ¶18). In the past homeless people have congregated on the sidewalks in these areas. (*Id.* at ¶¶20, 21). On any given day there would be more than 50 homeless persons present on these sidewalks for at least part of the day. (*Id.* ¶28). The sidewalks in these areas are extremely broad and some of the homeless persons actually lived under the underpasses and stored personal possessions there. (*Id.* ¶27). This was done neatly and did not in any way obstruct pedestrian or vehicular traffic. (*Id.*). The underpasses were a natural place for homeless persons to congregate as it allowed them to be sheltered from the elements and to be safe. (*Id.* ¶ 21). The underpasses are near places where homeless persons could use restrooms and were near various resources. (*Id.*). They are an effective and important place for homeless persons to congregate not only to avoid inclement weather and to rest and secure personal belongings, but also to meet with faith-based groups and other help organizations that provide basic resources. (*Id.* ¶ 36).

Nevertheless, the City of Indianapolis issued an "emergency" declaration that it followed with the removal of personal belongings that had been left on the sidewalks in the underpasses. (*Id.* ¶ 18; ECF 1-1). The City issued the emergency declaration and required that the underpasses be cleared of all belongings and items effective at 6 p.m.

---

[1] Inasmuch as discovery is ongoing, Mr. Young reserves the right to supplement the following factual information.

on August 8, 2017. (ECF 1-1). The basis for this "emergency" declaration was that:

> BLOCKING THE PUBLIC RIGHT-OF-WAY IN THIS AREA POSES IMMEDIATE RISK TO PUBLIC SAFETY. Storing items or laying in the public right-of-way in this bridge underpass creates public safety risk related to emergency evacuations, crowd safety around event venues, and fire hazards. Increased threats to public safety continue to focus on large crowds in confined, public spaces—particularly in areas near event venues. Congestion and cluttering of the area from personal belongings, or people, in the right-of-way inhibits safe passage by pedestrians and emergency first responders, blocks evacuation routes, and allows for concealment of threats targeting pedestrians and emergency first responders.

(*Id.*).

The definition of emergency is not at all clear. (ECF 12-1 ¶19). And, although the emergency order focused on property on the sidewalks of the underpasses, officers of the Indianapolis Metropolitan Police Department have interpreted the emergency order as prohibiting persons from congregating in these areas—not just sleeping, but sitting, standing, or stopping. (*Id.* ¶¶31-32). These prohibitions appear to apply only to persons who are homeless as persons who do not appear to be homeless have been allowed to congregate in these areas. (*Id.* ¶33).

Although the emergency has been declared the sidewalks under the overpasses remain open to pedestrians. Therefore, it is clear that the homeless persons are allowed to engage in some behavior that would take them through the "emergency" area. However, it is completely unclear what sort of behavior, short of sprinting through the area, will cause the police to determine that the emergency declaration has been violated.

[4]

**Argument**

I.  **Mr. Young and the putative class will prevail on the merits of their claims**

   A.  **The City is violating due process**

   1.  **It is unclear as to what behavior the emergency order applies and this offends due process**

   a.  *General principles concerning vagueness*

"[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." *Connally v. General Const. Co.*, 269 U.S. 385, 391 (1926) (citing *International Harvester Co. v. Kentucky*, 234 U.S. 216, 221 (1914); *Collins v. Kentucky*, 234 U.S. 634, 638 (1914)). It is therefore "[a] fundamental principle in our legal system . . . that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). The Supreme Court has stressed that the vagueness doctrine focuses not only on the need to provide notice to those seeking to determine what conduct is or is not prohibited but also on the need to prevent "arbitrary enforcement":

> [T]he more important aspect of the vagueness doctrine "is not actual notice, but the other principal element of the doctrine – the requirement that a legislature establish minimal guidelines to govern law enforcement." . . . Where the legislature fails to provide such minimal guidelines, a criminal statute may permit "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections."

*Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (internal citation omitted).

The "void-for-vagueness doctrine," *id.* at 357, applies not only to "laws which regulate persons or entities," *Fox Television*, 567 U.S. at 253, but also to ordinances. As the Court noted in *Grayned v. City of Rockford*, 408 U.S. 104 (1972), concerning the constitutionality of an allegedly vague anti-noise ordinance,

> Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.

*Id.* at 108-09 (footnotes omitted).

### b. The emergency declaration leaves completely unclear the conduct that is or is not permitted and this violates due process

On its face the emergency declaration addresses itself only to property being left on the sidewalks of the underpasses. However, as interpreted it is being used to prevent homeless persons from engaging in a range of activities under the bridges, including not only sleeping, but sitting on the sidewalks or even stopping for some period of time. However, the contours of the conduct prohibited are unclear. Can a homeless person walk through the area very slowly? What if she stops momentarily to converse with a friend or look at passing traffic? What is momentarily? What if it is raining very hard and the person stops for a few minutes until the rain stops? What if the person just wanders aimlessly under the underpass, but never leaves it? The bottom line is that it is

completely uncertain as to what conduct is or is not prohibited. The sidewalks remain open, but it is unclear what a homeless person on the sidewalk may do or not do so as not to be ordered by law enforcement to vacate the area. This is unconstitutional.

For decades, the United States Supreme Court has consistently found constitutional fault with statutes and ordinances that assert the right to ban persons from public spaces because they are engaging in apparently aimless behavior, such as "loitering," if the behavior is not tied to objective behavior that breaches the peace or interferes with other persons. Thus, in *Papachristou v. City of Jacksonville*, 405 U.S. 156 (1971), the Court struck down a vagrancy statute as unconstitutionally vague since it made criminal, among other things, "wandering or strolling around from place to place without any lawful purpose or object." *Id.* at 156 n.1. As the Court noted,

> [t]he difficulty is that these activities are historically part of the amenities of life as we have known them. They are not mentioned in the Constitution or in the Bill of Rights. These unwritten amenities have been in part responsible for giving our people the feeling of independence and self-confidence, the feeling of creativity. These amenities have dignified the right of dissent and have honored the right to be nonconformists and the right to defy submissiveness. They have encouraged lives of high spirits rather than hushed, suffocating silence.
>
> They are embedded in Walt Whitman's writings, especially in his 'Song of the Open Road.' They are reflected too, in the spirit of Vachel Lindsay's 'I Want to Go Wandering,' and by Henry D. Thoreau.

*Id.* at 164 (footnote omitted). The Court concluded that the ordinance was unconstitutionally vague, both because "it 'fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute,' . . . and because it encourages arbitrary and erratic arrests and convictions." *Id.* at 162 (internal citation

omitted). Arbitrary and erratic arrests were encouraged because the ordinance vested complete discretion in law enforcement as to who would or would not be cited.

> [T]here are no standards governing the exercise of the discretion granted by the ordinance, the scheme permits and encourages an arbitrary and discriminatory enforcement of the law. It furnishes a convenient tool for 'harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure.' . . . It results in a regime in which the poor and the unpopular are permitted to 'stand on a public sidewalk . . . only at the whim of any police officer.'

*Id.* at 170 (internal citations omitted).

In *Kolender*, the Court found unconstitutionally vague a California statute that required that persons who loiter or wander on public streets provide "credible and reliable" identification when asked by a police officer. The Court found that the requirement that "credible and reliable" identification be provided was unconstitutionally vague. 461 U.S. at 358. The Court noted that the problem with the statute is the same problem as any prohibition on "loitering"—"[a]n individual, whom police may think is suspicious but do not have probable cause to believe has committed a crime, is entitled to continue to walk the public streets 'only at the whim of any police officer' who happens to stop that individual under" the statute. *Id.* (quoting *Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 90 (1965)).

In *City of Chicago v. Morales*, 527 U.S. 41 (1999)[2], the defendants had been cited for violating Chicago's gang loitering ordinance that prohibited "'criminal street gang

---

[2] In *Morales* Justice Stevens wrote for the Court with respect to Parts I, II, and V of the opinion and for a plurality for Parts III, IV and VI . 527 U.S. at 45. This Memorandum will note whether the portions of the *Morales* case referred to are from the portion where Justice Stevens wrote for the Court or for the plurality.

[8]

members' from 'loitering' with one another or with other persons in any public place." *Id.* at 46. The ordinance noted that "'[l]oiter' means to remain in any one place with no apparent purpose." *Id.* at 47 n.2. The Court found that the ordinance was unconstitutionally vague inasmuch as it provided complete discretion to police officers to decide what activities were or were not covered by the ordinance. *Id.* at 60-65.[3]

The plurality in *Morales* noted that loitering ordinances and statutes have been upheld by lower courts only when the loitering is "combined with some other overt act or evidence of criminal intent. However, state courts have uniformly invalidated laws that do not join the term 'loitering' with a second specific element of the crime." *Id.* at 57-58 (footnotes omitted). This is hardly a unique observation. *See, e.g., Davis v. City of New York*, 902 F. Supp. 2d 405, 422 (S.D.N.Y. 2012) (prohibition of "loitering" by public housing residents was unconstitutionally vague as it "prohibits a vast swath of 'conduct that is inherently innocent,' it fails to give . . . residents notice of what precise conduct is prohibited and it 'places complete discretion in the hands of the police to determine whom they will arrest.'" [notes and citation omitted]); *Lytle v. Doyle,* 197 F. Supp. 2d 481, 490 (E.D. Va. 2001), *aff'd*, 326 F.3d 463 (4th Cir. 2003) ("Modern ordinances criminalizing loitering typically require evidence of criminal intent or some other overt act."); *NAACP Anne Arundel County Branch v. City of Annapolis,* 133 F. Supp. 2d 795, 808 (D.Md. 2001) ("[I]n general, only those anti-loitering ordinances interpreted as including a specific intent requirement have been upheld against both prongs of a

---

[3] The plurality also concluded that the Chicago ordinance impacted on "the freedom to loiter for innocent purposes [which] is part of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment." 527 U.S. at 53.

vagueness challenge."); *Ciccarelli v. City of Key West*, 321 So. 2d 472, 474 (Fla. Ct. App. 1975) (ordinance that prohibited loitering so as to hinder or impede or tending to do so was facially unconstitutional as it failed to "contain some restrictive standards which would limit its application to impediments to passage that threaten public safety or a breach of the peace"); *People v. Smith,* 254 N.W.2d 654, 656 (Mich. Ct. App. 1977) (noting that the loitering, by itself, cannot be a crime and that "'[r]ather some conduct deleterious to the public good must be connected to the loitering.'" [internal citation omitted]); *People v. Bright*, 520 N.E. 2d 1355, 1358 (N.Y. 1988) ("[A] statute that merely prohibits loitering, without more, is unconstitutionally vague. . . We have upheld loitering statutes only when they either prohibited loitering for a specific illegal purpose or loitering in a specific place of restricted public access.").

The emergency declaration is no different than a general prohibition on loitering or engaging in conduct of which the police do not approve. The problem the above cases note, and the problem here, is that there is conduct that is allowable and there is conduct that is not allowable and it simply is unclear what is allowable and what is not. This is the epitome of unconstitutional vagueness.

    **2.    The emergency order is fundamentally irrational in violation of due process**

The extraordinary nature of what the City is attempting to do here cannot be overstated. The City is attempting—albeit to an uncertain and unconstitutional degree—to restrict the access of homeless persons to public sidewalks on the basis that

[10]

there exists an apparently perpetual "emergency."[4] The emergency cited by the order is because of "increased threats to public safety . . . particularly in areas near event venues [c]ongestion and cluttering of the area from personal belongings, or people, in the public-right-of-way inhibits safe passage by pedestrians and emergency first responders." (ECF 1-1). Therefore, the City is claiming that it is necessary to prevent homeless persons from standing or sitting in these areas because there *may* be an emergency that *may* require mass evacuations and that this *may* involve this particular area in Indianapolis.

There is no doubt that government may have certain expanded powers if there is an actual emergency. *See, e.g., National Amusements, Inc., v. Borough of Palmyra*, 843 F. Supp. 2d 538, 541-42, 546 (D.N.J. 2012) (city did not violate due process by closing public access to flea market property without prior notice or hearing because of an imminent threat to public safety). But, the government does not have the power to declare emergencies when there are none. This is arbitrary and irrational and offends due process.

As this Court recently recognized

> [w]hen a fundamental right is not at stake, substantive due process still creates "a residual substantive limit on government action which prohibits arbitrary deprivations of liberty." *Hayden ex rel. A.H. v. Greensburg*

---

[4] It appears that the most important significance of the emergency declaration is that it allows the City to free itself from the obligation it would otherwise have to find housing for any homeless persons displaced by its actions. For, Section 232-503(d) of the Revised Code of the Consolidated City and County provides that before the City can displace homeless persons living on public property the City must wait until there is sufficient housing and services for the person; "provided, however, that if the city makes a written determination that an emergency exists, the city does not need to wait until there is sufficient available housing and services."

[11]

> *Community Sch. Corp.*, 743 F.3d 569, 576 (7th Cir. 2014). A law will survive such a challenge if the State can "demonstrate that the intrusion upon . . . .liberty is rationally related to a legitimate government interest." *Id.*; *Charleston v. Bd. of Trustees of Univ. of Ill. at Chi.*, 741 F.3d 769, 774 (7th Cir. 2013) ("Substantive due process requires only that the practice be rationally related to a legitimate government interest, or alternatively phrased, that the practice be neither arbitrary nor irrational."). It is ultimately the plaintiff's burden to demonstrate that the challenged law "lacks a rational relationship with a legitimate government interest; it is not the [government's] obligation to prove rationality with evidence." *Hayden*, 743 F.3d at 576. The plaintiff's burden is a "heavy one: So long as there is any conceivable state of facts that supports the policy, it passes muster under the due process clause; put another way, only if the policy is patently arbitrary would it fail." *Id.*

*Planned Parenthood of Indiana and Kentucky, Inc. v. Commissioner, Indiana State Department of Health*, —F. Supp. 3d—, No. 1-16-cv-763-WP-DML, 2017 WL 4224750, at *8 (S.D. Ind. Sept. 22, 2017).  On the other hand, if the government "has acted in an arbitrary and irrational way," due process has been violated. *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976).

Therefore, courts will strike down state action that is fundamentally irrational, arbitrary, or capricious. *See, e.g., Berger v. City of Mayfield Heights,* 154 F.3d 62, 624-26 (6th Cir. 1998) (finding an ordinance requiring that all growth from vacant lots be cleared if lot has less than 100 feet of street frontage to be irrational in violation of, among other things, substantive due process); *Buquer v. City of Indianapolis,* No. 1:11-cv-708 SEB-MJD, 2013 WL 1332158, *14 (S.D. Ind. Mar. 28, 2013) (finding that an Indiana law that prevented persons from using consular-issued identification cards for identification was "not rationally related to the stated government interest, and thus, violates substantive due process").

The City is positing a need to keep this area perpetually clear of even two homeless persons standing and talking because there might be an emergency that requires the evacuation of large groups of persons. To point out the obvious, this makes little sense. The Court can take notice that these streets are near sports arenas, but the Court can also take notice of the fact that the arenas are frequently not in use and therefore the 24-hour, 365-day-a-year ban created by the City strays far from rationality. Moreover, the sidewalks are wide here and the evidence shows that at no point, even when homeless persons slept in these areas, were they obstructed.[5] Indeed, if the City is concerned about mass evacuations during emergencies then the many other sidewalks in downtown Indianapolis should also be closed to all persons—especially as these sidewalks are much narrower than the sidewalks under the railroad bridges in question. The emergency declaration is an irrational action by the City. It offends due process.

> **B.** **To the extent that the emergency order is being applied to prevent homeless persons from congregating but not other persons, it violates equal protection**

The emergency declaration therefore violates due process. Moreover, no matter how it is interpreted, the evidence will demonstrate that it is being enforced against homeless persons and not against persons who are not perceived as homeless. This is a violation of elementary equal protection principles.

"The Equal Protection Clause of the Fourteenth Amendment commands that no

---

[5] Indianapolis ordinances do not prohibit persons from sleeping on sidewalks. They do, however, prohibit persons from obstructing the sidewalks. Sec. 645-513, Revised Code of the Consolidated City and County. There was no obstruction here.

state shall 'deny to any person within its jurisdiction the equal protection of the laws,' which essentially is a directi[ve] that all persons similarly situated should be treated alike." *Vision Church v. Village of Long Grove*, 468 F.3d 975, 1000 (7th Cir. 2006) (internal citation omitted). The first step in this analysis "is to identify the [defendants'] classification of groups," which can be accomplished by showing that a statute "imposes different burdens on different classes of people." *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 589 (9th Cir. 2008) (alteration in original) (citations omitted). The next step in equal protection analysis is to determine the applicable level of scrutiny, but even under the lowest level of scrutiny a classification must fail if there is no legitimate basis for the distinctions drawn. *See, e.g., Planned Parenthood of Indiana & Kentucky, Inc. v. Comm'r, Indiana Dep't of Health*, 64 F. Supp. 3d 1235, 1239-41 (S.D. Ind. 2014) (applying rational basis review in holding that treating two groups of medication abortion providers, abortion clinics and physician's offices, differently violates equal protection).

Admittedly, homeless persons are not a suspect class and the discrimination against them here is subject to only "rational basis" scrutiny. *See, e.,g., Joel v. City of Orlando*, 232 F.3d 1353, 1357 (11th Cir. 2000). Under this scrutiny, there must at least be a "reasonable basis" for the discrimination. *Baskin v. Bogan*, 766 F.3d 648, 654 (7th Cir. 2014). *Baskin* illustrates that this is not a toothless standard as the court there emphasized that "courts examine, and sometimes reject, the rationale offered by the government for the challenged discrimination." *Baskin v. Bogan*, 766 F.3d 648, 654 (7th Cir. 2014) (citing *Village of Willowbrook v. Olech*, 523 U.S. 562 (2000) (per curiam)). Thus, the Supreme Court has struck down government action as not rational. *See, e.g., Romer*

*v. Evans*, 517 U.S. 620, 626-35 (1996) (invalidating state constitutional amendment prohibiting governmental action to protect homosexual persons from discrimination because no rational basis supported the imposition of the special disability against one class of persons); *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 447-50 (1985) (invalidating zoning ordinance that excluded a group home for persons with intellectual disabilities because there was no rational basis to believe that the group home would pose any special threat to the city's legitimate interests); *Plyler v. Doe*, 457 U.S. 202, 223-30 (1982) (invalidating statute withholding state educational funding for undocumented children because it is not rational to impute a parent's misdeeds to his or her child); *U.S. Dep't of Agriculture v. Moreno*, 413 U.S. 528, 533-38 (1973) (invalidating a statute denying food stamp benefits to households with unrelated persons because, *inter alia*, it was not rationally related to the ostensible purpose of preventing fraud).

The City is treating homeless persons differently from those who are not. The former group is subject to negative police attention for even stopping under the railroad bridges; the latter group is not. There is no rational basis whatsoever for this differential treatment and it violates equal protection.

**II.     The other requirements for the grant of a preliminary injunction are met here**

    **A.     Plaintiff and the putative class are suffering irreparable harm for which there is no adequate remedy at law**

Without a preliminary injunction Mr. Young and the Indianapolis homeless community will continue to be subject to denial of both equal protection and due process. This Court has noted that judges of this district have concluded that if equal

[15]

protection is violated then irreparable harm is presumed. *See Exodus Refugee Immigration, Inc. v. Pence*, 165 F. Supp. 3d 718, 738-39 (S.D. Ind. 2016), *aff'd* 838 F.3d 902 (7th Cir. 2016). Similarly, the Court has noted that the denial of substantive due process is also deemed to be irreparable harm for which there is no adequate remedy at law. *Planned Parenthood of Indiana and Kentucky, Inc. v. Commissioner*, 194 F. Supp. 3d 818, 835 (S.D. Ind. 2016).

Moreover, aside from the constitutional niceties, the emergency declaration here prohibits Mr. Young and other homeless community from gathering in an area where they can be safe and sheltered. They have been banished from an area of Indianapolis to which they formerly were given full access. There are no damages that can compensate for this loss of basic freedom of mobility that, absent a preliminary injunction, will continue until after the final decision in this case. *See. e.g., Stuller, Inc. v. Steak N Shake Enterprises, Inc.*, 685 F.3d 676, 680 (7th Cir. 2012) ("Because this is harm that cannot be fully rectified by the final judgment after trial, it is irreparable." [internal quotations and citation omitted]).

### B. The balance of harms favor Mr. Young and the putative class

Mr. Young and Indianapolis' homeless are faced with the harms described above. And, because they have demonstrated a substantial likelihood of success on the merits, "no substantial harm to others can be said to inhere in its enjoinment." *See, e.g., Déjà vu of Nashville, Inc. v. Metro. Gov't of Nashville*, 274 F.3d 377, 400 (6th Cir. 2001); *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998). On the other hand, an injunction will only force the City to conform its conduct to the requirements of

constitutional law. A governmental entity cannot claim that requiring it to comply with the United States Constitution is harmful. *See Christian Legal Soc'y v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006) (holding that if a governmental entity "is applying [a] policy in a manner that violates [the plaintiff's] First Amendment rights . . . then [the] claimed harm is no harm at all." The balance of harms therefore favors the issuance of equitable relief.

      **C.**      **The public interest favors the issuance of a preliminary injunction**

The public interest is served by assuring compliance with the Constitution. *See, e.g., Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978) ("The existence of a continuing constitutional violation constitutes proof of an irreparable harm, and its remedy would serve the public interest.). The public interest therefore favors the issuance of a preliminary injunction here.

      **D.**      **The preliminary injunction should issue without bond**

The issuance of a preliminary injunction will not impose any monetary injuries on the City. In the absence of such injuries, no bond should be required. *See, e.g., Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996). Moreover, a bond should be waived when the plaintiffs have little or no money so that the bond requirement "would function to bar poor people from obtaining judicial redress." *Johnson v. Board of Police Com'rs*, 351 F. Supp. 2d 929, 952 (E.D. Mo. 2004). "In this case, most Plaintiffs are homeless, and all appear to lack sufficient resources from which to provide security. Requiring a bond in this case would effectively function to bar Plaintiffs from obtaining injunctive relief." *Id.* The same is true here and the bond should be waived.

**Conclusion**

All the requirements for the grant of a preliminary injunction are met and one should issue, without bond, enjoining the City from enforcing its emergency declaration.

*/s/ Kenneth J. Falk*
Kenneth J. Falk
No. 6777-49
Gavin M. Rose
No. 26565-53
Jan P. Mensz
No. 33798-49
ACLU of Indiana
1031 E. Washington St
Indianapolis, IN 46202
317/635-4059
fax: 317/635-4105
kfalk@aclu-in.org
grose@aclu-in.org
jmensz@aclu-in.org

Attorneys for Plaintiff and the Putative Class

**Certificate of Service**

I hereby certify that on this 4th day of October, 2017, a copy of the foregoing was filed electronically with the Clerk of this Court. A copy will be served by the Court's system on:

Lauren Nicole Hodge
Assistant Corporation Counsel
lauren.hodge@indy.gov

Nabeela Virjee
Assistant Corporation Counsel
nabeela.virjee@indy.gov

*/s/ Kenneth J. Falk*

[18]

                                                Kenneth J. Falk  
                                                Attorney at Law